UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
AT LEXINGTON

**Civil Action No. _____**

**UNITED STATES OF AMERICA**                                    Plaintiff,

v.

**LEXINGTON FOOT AND ANKLE CENTER, PSC** and
**MICHAEL C. ALLEN, DPM,**                                     Defendants.

---

### COMPLAINT

---

Plaintiff, the United States of America, by and through its undersigned counsel, alleges as follows:

### INTRODUCTION

1.      The United States of America ("United States" or the "Government") brings this action against Lexington Foot and Ankle Center PSC ("the Foot Center"), and its owner and operator, Michael C. Allen, DPM ("Dr. Allen"; with the Foot Center, "Defendants"), to recover treble damages and civil penalties for their violations of the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, and to recover damages under the common law theories of unjust enrichment and payment by mistake.

2.      From January 1, 2012, through the present, the Foot Center, at the direction of Dr. Allen, systematically defrauded Medicare and the Federal Employee Health Benefits Program by submitting false claims for non-reimbursable routine foot care procedures. Further, during this same period, the Foot Center, at Dr. Allen's direction, submitted to Medicare and the Federal Employee Health Benefits Program false claims for evaluation and

1

management services, seeking reimbursement for a level of medical service that Dr. Allen and other Foot Center practitioners did not actually provide.

3.      The false or fraudulent claims the Foot Center submitted, and that Dr. Allen caused it to submit, have resulted in loss to the named federal programs in excess of $1 million.

## JURISDICTION AND VENUE

4.      This action arises under the False Claims Act, 31 U.S.C. § 3729 *et seq.* The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1345 because the United States, as plaintiff, brings suit under this federal statute.

5.      The Court may exercise supplemental jurisdiction over the common law and equitable causes of action pursuant to 28 U.S.C. § 1367(a).

6.      The Court may exercise personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because at all relevant times Defendants resided and transacted business within the Eastern District of Kentucky.

7.      Venue is proper in the Eastern District of Kentucky pursuant to 28 U.S.C. §§ 1391(b) and (c), as well as 31 U.S.C. § 3732(a) and 21 U.S.C. § 843(f)(2). The Defendants can be found, reside, and transact business within this District, and the acts proscribed by the False Claims Act occurred within this District.

## PARTIES

8.      Plaintiff, the United States of America, brings this suit on its own behalf and on behalf of the United States Department of Health and Human Services ("HHS") and its operating division, the Centers for Medicare and Medicaid Services ("CMS"), and on behalf of the Office of Personnel Management ("OPM"), which administers the Federal Employees Health Benefits Program ("FEHBP").

9.     Defendant Lexington Foot and Ankle Center, PSC is a professional services corporation organized and registered in Kentucky. Its principal place of business is in Lexington, Fayette County, Kentucky. The Foot Center operates a podiatry practice that serves patients in the Central Kentucky area, including federal health care program beneficiaries.

10.     Defendant Michael C. Allen, DPM, is an individual who resides in Fayette County, Kentucky. Dr. Allen is a podiatrist, and at all times relevant to this Complaint was the owner and operator of the Foot Center. In this role, Dr. Allen participated in and supervised the Foot Center's daily operations, and directed the billing of claims to federal health insurance programs. At all relevant times, Foot Center's actions occurred at Dr. Allen's direction and with his approval and consent.

**DEFENDANTS' FALSE CLAIMS ACT VIOLATIONS**

**I.     The False Claims Act**

11.     The False Claims Act ("FCA") prohibits knowingly presenting, or causing to be presented, to the federal government a false or fraudulent claim for payment or approval. 31 U.S.C. § 3729(a)(1)(A). The FCA further prohibits knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim. 31 U.S.C. § 3729(a)(1)(B).

12.     Under the FCA, "knowingly" means that with respect to information, a person (i) has actual knowledge of the information, (ii) acts in deliberate ignorance of the truth or falsity of the information, or (iii) acts in reckless disregard of the truth or falsity of the information. 31 U.S.C. § 3729(b)(1). The FCA does not require that a defendant have a specific intent to defraud the federal government. 31 U.S.C. § 3729(b)(1)(B).

13.     For each violation of the FCA, a defendant is liable to the United States for civil penalties of not less than $5,000 and not more than $10,000 per false claim, as adjusted for

inflation, and three times the amount of damages that the Government sustained as a result of the defendant's actions. 31 U.S.C. § 3729(a)(1).

## II.   Government Healthcare Programs

### A.   The Medicare Part B Program

14.    The United States, through HHS, administers the Supplementary Medical Insurance Program for the Aged and Disabled established by Part B, Title XVIII, of the Social Security Act under 42 U.S.C. §§ 1395j through 1395w-4 (the "Medicare Part B Program"). HHS has delegated the administration of the Medicare Part B Program to its component agency, CMS.

15.    The Medicare Part B Program is a federally subsidized health insurance system for disabled people and people who are sixty-five years of age or older. Eligible people may enroll in the Medicare Part B Program to obtain benefits in return for payments of monthly premiums as established by HHS.

16.    In general, the Medicare Part B program pays for covered services, including podiatry services, based upon a fee schedule. 42 U.S.C. §§ 1395j-1395w-4. A beneficiary who is furnished a covered medical service can either pay for the medical service directly and request Medicare reimbursement, or assign the right to reimbursement to the supplier providing the service, which collects as an assignee of the beneficiary under 42 U.S.C. § 1395u(b)(3)(B)(ii).

17.    Payments under the Medicare Part B Program often are made directly to service providers or suppliers, such as podiatrists, rather than to the patient who is the Medicare beneficiary. This occurs when the provider or supplier accepts assignment of the right to payment from the beneficiary. In that case, the provider or supplier submits its bill directly to Medicare for payment.

18.     The United States reimburses Medicare claims from the Medicare Trust Fund through CMS, which in turn, contracts the task of processing and paying Part B claims to private insurance carriers under 42 U.S.C. § 1395u. Those carriers, referred to by CMS as Medicare Administrative Contractors ("MACs") also are authorized to conduct audits to ensure that proper payments are made to suppliers of services. *See* 42 U.S.C. § 1395kk-1(a)(4); 42 C.F.R. §§ 421.200(e), 421.400. Because of the volume of claims they must process, MACs generally pay providers' or suppliers' claims for services in the first instance based on the providers' or suppliers' representations that the services are billable under the applicable Medicare coverage rules.

19.     At all times relevant to this Complaint, CGS Administrators, LLC ("CGS") was the MAC that processed and paid Medicare Part B claims in the Commonwealth of Kentucky.

20.     At all times relevant to this Complaint, the Foot Center and Dr. Allen were enrolled providers in the Medicare Part B program.

21.     At all times relevant to this Complaint, the Foot Center and Dr. Allen submitted, or caused the submission of, claims to CGS seeking payment from the Medicare Part B program, and received payments from CGS on behalf of the Medicare Part B program.

### B.   The Office of Personnel Management Federal Employee Health Benefits Program

22.     The United States, through OPM, administers the Federal Employee Health Benefits Program ("FEHBP") (referred to collectively with the Medicare Part B Program as the "Government Healthcare Programs"). *See* 5 U.S.C. §§ 8901 *et seq.* The FEHBP is a federally funded health care program established by Congress in 1959, pursuant to the Federal Employees Health Benefits Act. *Id.* OPM administers this program and contracts with various health insurance carriers to provide services to FEHBP members. *Id.* at §§ 8902, 8909(a).

23.     Monies for FEHBP are maintained in the Employees Health Benefits Fund ("Treasury Fund"), which OPM administers. *Id.* at § 8909(a).

5

24.     The Treasury Fund is the source of all relevant payments to the insurance carriers for services rendered to members. The United States Treasury holds and invests in the Treasury Fund. *Id*. at § 8909.

25.     At all times relevant to this Complaint, the Foot Center and Dr. Allen submitted, or caused the submission of, claims to OPM-contracted insurance carriers seeking payment from the FEHBP and received payments from contracted carriers on behalf of the FEHBP.

### C.   Coding and Coverage Criteria

26.     To submit claims to insurance programs like the Government Healthcare Programs, medical providers use the American Medical Association's Current Procedural Terminology ("CPT") numeric codes to describe the procedures or services they rendered to patients. *See* 45 C.F.R. §§ 162.1002(a)(5), 162.1002(b)(1), and 162.1002(c)(1) (requiring providers to use CPT codes when billing Medicare).

27.     CPT codes are assigned allowable charges, which are published in a fee schedule.

28.     Healthcare providers must use the appropriate CPT code on claims when seeking reimbursement from the Government Healthcare Programs. It is a provider's responsibility to ensure that the codes selected on the claim reflect the services rendered to the patient.

### 1.   *Non-Coverage of Unnecessary Services and Routine Foot Care*

29.     The Government Healthcare Programs do not cover any and all services a health care provider might render to a patient.

30.     In particular, neither Medicare Part B nor FEHBP pays for medical services—including podiatry services—that are not reasonable and necessary for the diagnosis or treatment of the patient's illness or injury. 42 U.S.C. § 1395y(a)(1)(A) (excluding from

payment under Medicare medically unnecessary services); 5 U.S.C. § 8902a(c)(4) (billing for medically unnecessary services a basis for debarment from OPM-administered programs).

31.     With few exceptions, Medicare Part B also does not pay for routine foot care, including the cutting or removal of corns or calluses, the trimming or debridement of nails, routine hygienic care, and any service performed in the absence of localized illness, injury, or symptoms involving the feet. 42 U.S.C. § 1395y(a)(13)(C); 42 C.F.R. § 411.15(*l*)(1)(i); Medicare Benefit Policy Manual, Chapter 15 § 290(B)(2).

32.     Like Medicare, except in limited circumstances, the FEHBP does not cover routine foot care.

33.     Foot care that would otherwise be considered routine may be covered when systemic conditions such as metabolic, neurologic, or peripheral vascular disease result in severe circulatory embarrassment or areas of diminished sensation in an individual beneficiary's legs or feet. Medicare Benefit Policy Manual, Chapter 15 § 290(C)(3).

34.     The Medicare Benefit Policy Manual gives examples of underlying diseases that "might justify coverage for routine foot care." *Id.* at § 290(D). However, the Manual goes on to state that "[r]elatively few claims for routine-type care are anticipated considering the severity of the conditions contemplated as the basis for this exception. Claims for this type of foot care should not be paid in the absence of convincing evidence that nonprofessional performance of the service would have been hazardous for the beneficiary because of an underlying systemic disease. The mere statement of a diagnosis such as those mentioned above in § D does not of itself indicate the severity of the condition."

35.     In the absence of a systemic condition that results in circulatory embarrassment, foot care that would otherwise be considered routine may be covered for an ambulatory patient if there is clinical evidence of mycosis of the toenail—a disease caused by an infection with fungus—and the individual beneficiary has marked limitation of ambulation, pain, or secondary infection resulting from the thickening and dystrophy of the

infected toenail plate. For a non-ambulatory patient, treatment of mycotic nails may be covered if there is clinical evidence of mycosis of the toenail and the individual beneficiary suffers from pain or secondary infection resulting from the thickening and dystrophy of the infected toe plate. *Id.* at § 290(C)(4).

36.     When a physician performs what would otherwise be non-covered routine foot care, the care may be entitled to a presumption of coverage if the patient exhibits certain physical or clinical symptoms that render it medically necessary. *Id.* at § 290(F) (presumption of coverage applies "where the evidence available discloses certain physical and/or clinical findings consistent with the diagnosis and indicative of severe peripheral involvement").

37.     For the presumption to apply, physicians must observe and document certain findings in the patient's medical record, which are divided into three categories:

> a.  **Class A findings** include the nontraumatic amputation of foot or integral skeletal portion thereof.
>
> b.  **Class B findings** include an absent posterior tibial pulse, absent dorsalis pedis pulse, or three advanced trophic changes, which include: (i) decrease or absence of hair growth, (ii) nail changes (thickening), (iii) pigmentary changes (discoloration), (iv) skin texture (thin, shiny), or (v) skin color (rubor or redness).
>
> c.  **Class C findings** include claudication, temperature changes (e.g., cold feet), edema, paresthesias (abnormal spontaneous sensations in the feet), and burning.

38.     When billing Government Healthcare Programs for routine foot care entitled to the presumption of coverage, providers use class findings modifiers, or "Q modifiers," that correspond with the particular symptoms a physician observed. For example, a "Q8" modifier applies when two of the Class B findings were present and a "Q9" modifier applies when one Class B finding and two Class C findings were present.

## 2. *Coverage of Evaluation and Management Services*

39.     Evaluation and management ("E/M") services refer to services furnished by physicians and certain non-physician practitioners, including nurse practitioners, clinical nurse specialists, and physician assistants. These services often are billed to Government Healthcare Programs in the context of patient visits to a physician's office.

40.     The CPT codes to bill for E/M services are organized into various categories and levels. In general, the more complex the visit, the higher the level of code the physician or non-physician practitioner may bill within the appropriate category.

41.     There are three key components to E/M services: (1) patient history; (2) examination; and (3) medical decision-making, which refers to the complexity of establishing a diagnosis or selecting a treatment option. These components must be documented in the patient's medical record for the E/M service to be covered by the Government Healthcare Programs.

42.     Medicare's Claims Processing Manual states that, "Medical necessity of a service is the overarching criterion for payment in addition to the individual requirements of a CPT code. It would not be medically necessary or appropriate to bill a higher level of evaluation and management service when a lower level of service is warranted." Chapter 12, § 30.6.1 – Selection of Level of Evaluation and Management Service.

## III.     The Defendants' Scheme to Defraud

43.     Between January 1, 2012, and the present, the Defendants defrauded the Government Healthcare Programs by (a) billing for routine foot care while falsely claiming that the services were medically necessary and fit within an exception to the Government Healthcare Programs' exclusion of coverage for routine foot care, and (b) billing for a level of E/M service they did not provide.

9

44.     Defendant Foot Center engaged in this conduct at the direction of its owner, Defendant Dr. Allen. Dr. Allen not only directed the false billing, but also provided some of the non-covered routine foot care services and E/M services that the Foot Center billed at an exaggerated level and had direct personal knowledge of the bills' falsity.

45.     Dr. Allen and the Foot Center previously settled a False Claims Act complaint in 2010 for alleged misconduct that included, *inter alia*, billing Medicare for medically unnecessary nail debridement when in fact Dr. Allen and the Foot Center were merely trimming toenails.

## A.  False Claims for Non-Covered Routine Foot Care

46.     Routine foot care includes the clipping, trimming, and debridement of nails — including the debridement of mycotic (fungal) nails.

47.     Nail debridement involves reduction of nail bulk and girth to the level of reasonably expected normal nail thickness. Trimming nails involves reduction in nail length.

48.     Trimming the ends of toenails is not debridement.

49.     Providers use the following CPT codes to bill for nail trimming and nail debridement:

> a.  11719, Trimming of nondystrophic nails, any number
>
> b.  11720, Debridement of nail(s) by any method(s); 1 to 5 [nails]
>
> c.  11721, Debridement of nail(s) by any method(s); 6 or more [nails]

50.     Of these procedures, Government Healthcare Programs pay the highest reimbursement for a debridement of six or more nails, CPT code 11721.

51.     As mentioned above, routine foot care is only reimbursable in cases where patients have certain systemic conditions or exhibit specific symptoms that require a medical provider to provide the care. At most, Medicare reimburses for covered routine foot care every sixty-one days, but only if a patient's medical need dictates such frequent routine care.

52.     Defendants train the Foot Center's billing and administrative staff to ensure that patient records for routine foot care include key terms and physical findings that would ensure payment from federal health care programs.

53.     The Foot Center's patient records use boilerplate language designed to maximize reimbursement, with wording and syntax that migrates from patient to patient and/or provider to provider.

54.     For example, records for patients who purportedly had six or more of their toenails debrided frequently contain the vague stock phrase, "Class findings have been evaluated and are charted as follows: claudication, decrease or absence of hair growth, discoloration of skin, paraesthesia, rubor or redness of skin, temperature changes, thickening of nails and thin or shiny skin." This stock phrase ensures that class findings required to apply a presumption of coverage to otherwise routine foot care are included in a patient's medical record, regardless of what conditions the patient exhibited at the time of treatment. *See supra* ¶¶ 36-37.

55.     The language is conclusory, with none of the elaboration that would be present had a provider genuinely observed the symptoms, and is inconsistent with or contradicts other parts of a patient's medical record.

56.     Dr. Allen and his staff train and encourage the Foot Center's podiatrists to use the template terms and records, regardless of whether they actually observed the documented symptoms or the patient had the recorded diagnosis.

57.     For example, Dr. Allen told Dr. Ramona Brooks, a Foot Center podiatrist, always to indicate that a patient had pain, onychomycosis, or trouble walking to ensure claims were paid. Dr. Allen also told her that everyone suffers from atherosclerosis, a vascular issue frequently symptomized by a diminished pulse or blood flow, and Dr. Brooks witnessed Dr. Allen documenting the diagnosis even where a patient did not have atherosclerosis.

11

58.     Additionally, the Foot Center places its patients on a standardized foot care program designed to maximize the number of times patients receive routine foot care to the fullest extent allowed by Medicare and attempts to schedule almost all patients for follow-up visits every nine weeks, or sixty-three days, regardless of individual medical need.

59.     To maximize billings further, the Foot Center, at Dr. Allen's direction, billed the Government Healthcare Programs for six-or-more-toe nail debridement using CPT code 11721 even where providers merely trimmed patients' nails.

60.     The Foot Center submitted claims to Medicare for nail debridement using CPT code 11721 at a level well above its peers. For example, in 2017 the Foot Center billed Medicare using CPT Code 11721 approximately ninety-seven percent of the time. The Foot Center sought reimbursement using the lesser debridement code, 11720, for just under three percent of its claims and billed for nail trims using 11719 less than one percent of the time. During the same period, the ratio for podiatrists nationally was seventy percent using 11721, a little more than twenty percent using 11720, and more than nine percent using 11719.

61.     Dr. Allen told Foot Center podiatrist Dr. Jeffrey Richardson to use CPT code 11721, no matter the number of toes that actually required debridement. Accordingly, Dr. Richardson used 11720 to bill for debridement of five or fewer nails in only rare cases, like when a patient was an amputee and only had five or fewer toes.

62.     On rare occasions when Foot Center billing staff received a superbill from the provider indicating that CPT code 11720 should be billed for five-toe debridement or CPT code 11719 should be billed for nail trims, billing staff would review the patient's records to see why it was not submitted as a six-or-more-toe debridement.

63.     Foot Center billing staff changed patient notes indicating that a provider performed a nail trim to support a six-or-more-toe debridement because it paid more money.

64.     When superbills did not match the patient notes in a medical record, Foot Center management told billing staff that the notes could be changed later to match the

superbill. If an insurer denied a claim, Foot Center billing staff would tell Dr. Allen what he needed to include in, add to, or change about the patient's note to support a claim. Dr. Allen would make the suggested changes, and billing staff would resubmit the claim.

65.     Dr. Allen instructed nurse practitioner Citadel Ibisate, who has provided nearly all the routine foot care to Foot Center patients at area nursing homes and independent living facilities since late 2016, that nail debridement and a nail trim were the same thing. Thus, even if she only performed a toenail trim, she would document it as nail debridement in the medical record.

66.     Dr. Allen knows that a nail trim and nail debridement are not the same thing.

67.     Dr. Allen's instructions to bill CPT code 11721 for a six-or-more-toe debridement, his instructions that falsely conflated nail debridement and nail trims, the Foot Center's cloned medical records, and the Foot Center's reflexive scheduling of patient visits regardless of medical need, all led to the submission of numerous false claims to the Government Healthcare Programs in both the office and nursing home settings.

### 1. *False Claims for In-Office Routine Foot Care*

68.     By way of representative example, the Foot Center billed Medicare eighteen times for routine foot care provided to patient R.W. from March 26, 2012, through July 20, 2015. The Foot Center regularly scheduled R.W. for routine foot care, treating her every sixty-three to seventy days with few exceptions. R.W. received these routine foot care services at these regular intervals until her death on August 8, 2015.

69.     The Foot Center's medical records for R.W.'s routine foot care do not support the medical necessity of the services billed to Medicare. Instead, they contain copy-pasted language—or are entirely cloned—to falsely document symptoms and findings designed to guarantee payment.

70.     For example, encounter notes in R.W.'s medical record for July 15, 2013, November 18, 2013, January 27, 2014, April 7, 2014, June 16, 2014, August 25, 2014, November 3, 2014, March 2, 2015, May 4, 2015, and July 20, 2015, are identical in all relevant respects. *See* **Exhibit 1**.

   a.  R.W.'s recorded weight and BMI, her dorsalis pedis and posterior tibial pulses, muscle strength, and skin temperature remain identical during the two-year period covered by the cloned records.

   b.  The notes for July 15, 2013, November 18, 2013, and January 27, 2014, are identical in every respect, except for the name of the provider who purportedly conducted the examination and R.W.'s age.

   c.  Starting on April 7, 2014, the notes add the phrase "class findings: thin skin discoloration thickened toenails. [*sic*] contacted [*sic*] toes with bony prominences," but are otherwise identical.

   d.  The only notable changes in the record occur when a provider adds a sentence to the otherwise cloned encounter note to justify billing Medicare for an additional service or durable medical equipment.

71.     The Foot Center providers created these cloned records to justify claims for the services provided to R.W., which were not medically reasonable or necessary and consisted of routine foot care that Medicare did not cover.

72.     For example, on or about July 23, 2015, Medicare received a claim for reimbursement from the Foot Center for a six-or-more toe debridement provided to R.W. by Foot Center provider Dr. Bradford Fine on July 20, 2015 (Claim Number 662815204440280). Medicare paid the Foot Center $32.34 for this service.

73.     As described above, the patient note for R.W.'s debridement service from July 20, 2015, is nearly identical to the one preceding it. Ex. 1 at 9-10. Much of the cloned language included in the record fails to give specifics that would justify payment.

74.     The Foot Center used a Q8 modifier, indicating that Dr. Fine had observed two Class B findings that would support billing Medicare for the otherwise non-covered routine foot care procedure. However, the boilerplate class findings included to justify payment are unsubstantiated in the remaining record, contradictorily noting class findings for R.W.'s skin while noting elsewhere that the "skin inspection [was] unremarkable."

75.     Medicare reimbursed the Foot Center for this false or fraudulent claim. But Medicare would not have paid this claim if it had known that the routine foot care procedure was not medically necessary, or that the underlying medical record was cloned and falsified.

76.     The Defendants knew or should have known, within the meaning of the FCA, that these services were not medically necessary and that the related claims for payment and underlying cloned medical records misrepresented the necessity of the service.

77.     The claim identified in paragraph 72 is a representative example only. The Foot Center followed the same practice of performing routine foot care procedures, most of them unreasonable and unnecessary, for hundreds of other Government Healthcare Program beneficiaries not identified within this Complaint. The Foot Center knowingly submitted claims for payment, and Dr. Allen knowingly caused the submission of claims for payment, for unnecessary routine foot care in the office setting and received reimbursements from Government Healthcare Programs as a result.

### 2.   *False Claims for Nursing Home Routine Foot Care*

78.     Throughout the relevant period, the Foot Center has provided podiatry care at more than fifty area nursing homes, residential care facilities, or independent living facilities (referred to collectively as "nursing homes").

79.     Until late 2016, the Foot Center split responsibility for nursing home visits among several podiatrists and a nurse practitioner, with Dr. Richardson handling more visits than any other provider.

80.     Sometime around October or November 2016, Ibisate and Chris Moore, an x-ray technician and medical assistant, took over the nursing home visits for the Foot Center, providing nearly all of the "podiatry care" to nursing home residents from that point to present.

81.     Patients in nursing homes are first placed on the list for podiatry care by nursing home staff or the patients themselves, but staff and patients do not make any medical assessment prior to signing up. Rather, they depend on the Foot Center to determine what, if any, treatment is required and medically necessary.

82.     The Foot Center has implemented an automated treatment protocol using template records, reflexive billing practices, and the automatic rescheduling of patients designed to maximize reimbursement for routine foot care administered at nursing homes.

83.     Before each visit, Foot Center staff created a "recall list" of patients, with the date of the visit, the patient's name and phone number, and the "recall reason code." The recall reason is always "11721," for a six-or-more-toe debridement.

84.     Patients on the recall list automatically receive foot care unless they refuse treatment or are otherwise unavailable. Generally, a provider spends on average less than ten minutes with a patient, but more often, it is less than five.

85.     During the nursing home visits, providers do not examine patients or otherwise assess whether they are exhibiting symptoms that would render routine foot care medically necessary.

86.     Sometime after leaving the facility, providers fill out medical charts using the templates with the stock language described in paragraphs 53 through 56 with assessments and treatment that were not provided. As such, encounter notes for all patients treated during a nursing home visit often are identical except for the patients' names and ages.

87.     As discussed in paragraph 65, *supra*, Dr. Allen trained Ibisate that nail trims and debridement are the same. As a result, she documented all her nursing home encounters

as debridement, using the record "templates" to create encounter notes for all the nursing home patients she and Moore treated that day, even if they only trimmed patients' nails.

88.     Indeed, the United States has not identified a single Medicare claim from the Foot Center for a nail trim on which Ibisate is the rendering provider.

89.     Foot Center managers instructed billing staff to always bill nursing home patients as receiving a debridement, and never anything less.

90.     Likewise, the decision of which patients should receive further foot care is automatic. Foot Center staff places all patients on the recall list for every visit, with the predetermined recall reason code "11721," and they remain on the recall list until they die or the patient or a family member asks the Foot Center to remove them.

91.     With Dr. Allen's knowledge and consent, the Foot Center established a pattern of visiting nursing homes in nine-week rotations to maximize billing, recalling every patient during each visit.

92.     Defendants' practices have resulted in the repeated submission of false claims to federal programs, including Medicare and OPM, related to their nursing home visits.

93.     By way of representative example, V.S. is a resident of a nursing home at which the Foot Center has provided podiatry services since 2012.

94.     Sometime prior to October 14, 2013, V.S. had bilateral transmetatarsal amputations, or amputations of part or all of both forefeet. **Exhibit 2.** In fact, the Foot Center performed at least the transmetatarsal amputation of V.S.'s right foot, billing Medicare for the procedure in November 2011. As a result, V.S. has no toes.

95.     On May 30, 2017, Ibisate and Moore provided podiatry services at the facility where V.S. lives.

96.     The recall list for that day has a handwritten notation with V.S.'s name and a check beside it, indicating that she was seen that day. The recall list offers no further insight into V.S.'s treatment.

97.     On or about September 22, 2017, the Foot Center billed Medicare using CPT code 11721 seeking reimbursement for a six-or-more-toe debridement that Ibisate purportedly provided to V.S. during the May 30 visit (Claim Number 662817265682870).

98.     The claim submitted by the Foot Center also lists a diagnosis of "tinea unguium," which is a fungal infection of the nail.

99.     This diagnosis is one that Foot Center staff frequently and reflexively included in claims to ensure that Medicare would pay them.

100.    Ibisate did not diagnose V.S. with a fungal infection of the nail based on any actual observation or examination of V.S.'s feet.

101.    Medicare paid the Foot Center $28.15 for the debridement of V.S.'s non-existent toenails.

102.    Medicare would not have paid this claim had it known of its falsity.

103.    In accordance with the Foot Center's practice, V.S. was placed on the recall list for the next two scheduled visits at her facility, August 29, 2017, and October 31, 2017, with the predetermined recall reason of "11721 [debridement of six or more toenails]." **Exhibit 3** at 1-4.

104.    During the visit on October 31, 2017, Ibisate noted of V.S. "no nails transmet[atarsal] amp[utation] B/L [bilateral]," correctly observing that, because V.S. was a double transmetatarsal amputee, she had no nails that could receive debridement. Ex. 3 at 4.

105.    Despite this notation, Foot Center staff again reflexively placed V.S. on the recall list for a debridement for the next scheduled visit. Ex. 3 at 6-7.

106.    By way of further representative example, on January 30, 2018, Ibisate and Moore provided podiatry services to twenty-two patients at Brookdale Richmond Place, an independent living facility located in Lexington, Kentucky ("Brookdale").

107.    The visit lasted less than an hour.

18

108.    Ibisate and Moore only trimmed patients' nails, using medical-grade nail clippers. The clippers were the only tools they brought with them other than gloves, sterilizer, and a vacuum.

109.    Ibisate and Moore did not take notes or maintain documentation apart from the recall lists. They did not take vital signs or otherwise conduct medical assessments of patients.

110.    Ibisate and Moore did not perform nail debridement on any patient they treated at Brookdale on January 30, 2018.

111.    On or about February 20 and 21, the Foot Center submitted false claims for payment to Medicare seeking reimbursement for six-or-more-toe nail debridement, using CPT Code 11721, for five of the Brookdale patients whose nails were trimmed on January 30, 2018 (Claim Numbers 662818052575850, 662818052376330, 662818052376340, 662818051768130,[1] and 822218051321630).

112.    Medicare paid Foot Center $57.44 for Claim Numbers 662818052376340 and 822218051321630. But Medicare would not have paid these claims had it known that the routine foot care was not medically necessary or that a debridement was not performed.

113.    Because they had not met their deductible, the three remaining Brookdale residents were required to pay for treatment they had not received, in an amount totaling $109.19.

114.    Two of these residents were interviewed prior to receiving treatment.

115.    Eighty-eight-year-old A.B. confirmed that she had only received nail trims during the Foot Center's visits to the facility.

---

[1] The Foot Center used the National Provider Identification (NPI) for the Lexington Diabetic Center, PSC (d/b/a Lexington Diabetic Center & Family Care), of which Dr. Allen is the owner and president, on this false claim.

116.    A.B.'s feet were photographed before and after the January 30 visit. **Exhibit 4**. The photographs demonstrate that A.B. did not receive nail debridement on January 30, 2018.

117.    The Foot Center submitted to Medicare a false claim for this "service" (Claim Number 662818052575850). Because A.B. had not met her deductible, Medicare did not pay for the procedure, and A.B. was required to pay $36.64.

118.    M.E., age sixty-nine, also received podiatry care during the January 30 visit.

119.    M.E. allowed investigators to photograph her feet before and after the January 30 observed visit. **Exhibit 5**.

120.    The photographs of M.E.'s feet clearly show that M.E. only received a nail trim on January 30.

121.    The Foot Center submitted to Medicare a false claim for the "service" provided to M.E. (Claim Number 662818052376330). M.E. had not met her deductible, and Medicare did not pay for the service. Thus, M.E. was required to pay $36.64 for nail debridement that she did not receive.

122.    By way of further representative example, H.H. is a nursing home patient who received routine foot care from Dr. Richardson from July 28, 2015, until April 18, 2016.

123.    During this nine-month period, the Foot Center submitted five claims to Medicare seeking reimbursement for the debridement of six or more of H.H.'s toenails, using CPT Code 11721, that Dr. Richardson purportedly performed.

| Claim Number | Service Date | CPT Code | Modifier | Provider | Amount Paid |
|---|---|---|---|---|---|
| 662815244657930 | 7/28/2015 | 11721 | Q9 | Jeff Richardson | $32.34 |
| 662815315353620 | 10/6/2015 | 11721 | Q8 | Jeff Richardson | $32.34 |
| 662815352716780 | 12/15/2015 | 11721 | Q8 | Jeff Richardson | $32.34 |
| 662816071684450 | 2/16/2016 | 11721 | Q9 | Jeff Richardson | $32.28 |
| 662816116740260 | 4/19/2016 | 11721 | Q9 | Jeff Richardson | $32.28 |

124.    Medicare paid the Foot Center $161.58 because of these claims.

125.    However, H.H.'s medical records, which are cloned from the first visit to the last, do not support the medical necessity of this routine foot care. *See* **Exhibit 6.**

126.    For example, Claim Number 662815315353620 for H.H.'s treatment on October 6, 2015, includes a Q8 modifier, indicating that Dr. Richardson observed two Class B findings that rendered routine foot care medically necessary.

127.    Dr. Richardson's note for the October 6, 2015, debridement procedure—cloned from the July 28 visit—contains the Foot Center's laundry list of boilerplate class findings: "claudication, decrease or absence of hair growth, discoloration of skin, paraesthesia, rubor or redness of skin, temperature changes, thickening of nails and thin or shiny skin."

128.    However, the remainder of the note either contains no support for these conclusions or directly contradicts them. For example, despite noting that his examination of H.H.'s skin was "unremarkable," Dr. Richardson includes boilerplate class findings that H.H.'s skin was red, discolored, and "thin or shiny."

129.    Each of the cloned notes in H.H.'s medical record suffer these same defects, and fail to justify the medical necessity of the procedures.

130.    The claims for payment listed in paragraph 123 are false within the meaning of the FCA because they were not medically necessary and their underlying medical records are cloned and falsified.

131.    Medicare would not have paid the Foot Center for these claims if it had known that the routine foot care was not medically necessary, or that the underlying medical records were cloned and falsified.

132.    The Defendants knew or should have known, within the meaning of the FCA, that these services for routine foot care services were not medically necessary and that the related claims for payment and underlying cloned medical records misrepresented the necessity of the service.

133.    The claims identified in paragraphs 97, 111, and 123 are representative examples only. The Foot Center followed the same practice of performing routine foot care procedures, most of them unreasonable and unnecessary, for hundreds of other Government Healthcare Program beneficiaries not identified within this Complaint. The Foot Center knowingly submitted claims for payment, and Dr. Allen knowingly caused the submission of claims for payment, for unnecessary routine foot care in the nursing home setting and received reimbursements from Government Healthcare Programs as a result.

**B.  Underline False Claims for E/M Services**

**1.  *False Claims for E/M Services Billed at a Level the Foot Center Did Not Provide***

134.    At all relevant times, the Defendants improperly billed government programs for E/M visits using 99203 and 99213 ("Level 3" services) when no such services were actually provided or when a lower CPT code would have been more appropriate.

135.    CPT code 99203 is used to describe services provided in the office setting for the evaluation and management of a new patient. Proper use of this code requires that all three of the following components be performed by the practitioner: (1) a detailed history, (2) a detailed examination, and (3) medical decision-making of low complexity. The American Medical Association guidelines for this code state: "[u]sually, the [patient's] presenting problem(s) are of moderate severity. Typically, 30 minutes are spent face-to-face with the patient and/or family."

136.    Similarly, CPT code 99213 is used to describe services provided in the office setting for the evaluation and management of an established patient. Proper use of this code requires at least two of the three following components be performed by the practitioner: (1) an expanded problem-focused history, (2) an expanded problem-focused examination, and (3) medical decision-making of low complexity. The American Medical Association guidelines for this code state: "[u]sually, the [patient's] presenting problem(s) are of low to

moderate severity. Typically, 15 minutes are spent face-to-face with the patient and/or family."

137.    As summarized in the table below, the Foot Center and Dr. Allen are outliers in the percentage of their claims seeking Level 3 E/M CPT codes when compared to other Medicare-enrolled podiatrists. For example, ninety-eight percent of the claims submitted for Dr. Allen's encounters with new patients were billed using CPT 99203, as compared with seventy-three percent of Defendants' peers:

| CPT Code | Foot Center | Dr. Allen | Peer podiatrists |
|----------|-------------|-----------|------------------|
| 99203    | 83%         | 98%       | 73%              |
| 99213    | 92%         | 92%       | 67%              |

138.    As with routine foot care procedures, the Foot Center's electronic medical records system permitted practitioners to clone medical notes to justify claims for E/M services. This ability to easily clone notes enabled the Foot Center to create the illusion that its practitioners were performing Level 3 E/M services when, in fact, they were not.

139.    Foot Center providers used the "template" encounter notes, carrying over whole sections detailing a patient's medical history, medical examination, or treatment plan from visit to visit without actually performing these key components of an E/M service each time.

140.    Dr. Allen encouraged providers and administrative staff to falsely document all patient encounters as these mid-level services.

141.    For example, during a "pep talk" with Dr. Richardson about how to increase his billings, Dr. Allen told Dr. Richardson that any patient who enters the facility should be considered a Level 3 patient.

142.    At times, Dr. Allen would purport to provide an E/M service to a patient without touching the patient, putting on gloves, or even fully entering the examination room. Foot Center employees described these services as "walk-by examinations."

143.    The Foot Center would nonetheless bill Dr. Allen's "walk-by examinations" as Level 3 E/M services.

144.    A Statistical Sampling for Overpayment Estimation (SSOE) was prepared for all Medicare claims submitted by the Foot Center using CPT Code 99213 between January 1, 2012, through approximately May 11, 2017, ("sample period") for E/M services provided to established patients in both the office and nursing home settings. A review of patient files selected as part of the SSOE revealed that nearly ninety-five percent of the claims from the sample period were billed falsely to Medicare because the Foot Center either billed the E/M services at a level practitioners did not provide or billed for a level of service that was impossible to verify because the underlying medical record contained cloned patient notes.

145.    By way of representative example, J.P. was a patient at the Foot Center from sometime in 2006 until sometime in 2017. He received routine foot care services and treatment for a diabetic ulcer on his left ankle.

146.    Of the Foot Center's seventy-five claims to Medicare for office encounters with J.P. between May 9, 2012, and February 1, 2017, seventy-two were for Level 3 E/M services using CPT code 99213.

147.    J.P.'s medical records for April 24, 2013, May 8, 2013, and June 19, 2013, are identical in all relevant respects. **Exhibit 7** at 2-4. This includes the subjective complaint, which fails to update J.P.'s age and includes language lifted from a February encounter indicating that J.P. would receive "further vein ablation in March." *Compare* Ex. 7 at 1 *and* 2-4.

148.    Each of the medical notes for these three dates of service indicate that Dr. Allen was the treating provider.

149. The Foot Center billed Medicare using CPT code 99213 for each of these dates of service. Contrary to the encounter notes in J.P.'s medical record, the Foot Center claims that Dr. Fine provided the E/M services on two of the three dates of service.

| Claim Number | Service Date | CPT Code | Provider | Amount Paid |
|---|---|---|---|---|
| 662813133720750 | 4/24/2013 | 99213 | Bradford Fine | $52.83 |
| 662813141613660 | 5/8/2013 | 99213 | Bradford Fine | $52.83 |
| 662813193547960 | 6/19/2013 | 99213 | Michael Allen | $52.83 |

150. As a result of these claims, Medicare paid the Foot Center approximately $158.49.

151. The services identified in paragraph 149 were not provided at the level billed to Medicare, and the subsequent claims for payment were false or fraudulent within the meaning of the FCA.

152. Medicare would not have paid these claims if it had known of the claims' false and fraudulent nature, or the underlying false medical records.

153. Dr. Joseph Skurka was J.P.'s primary podiatrist at the Foot Center. He, too, created cloned medical records to justify services provided to J.P. that fail to substantiate the key components of a Level 3 E/M service.

154. For example, the Foot Center billed Medicare for a Level 3 E/M service purportedly rendered to J.P. by Dr. Skurka on May 5, 2015, using CPT Code 99213 (Claim Number 662815127609970).

155. However, the note for the May 5 visit in J.P.'s medical record is nearly identical to the note for the visit immediately preceding it on April 14, 2015. **Exhibit 8**.

156. Notably, the chief complaint, history of present illness, past family and/or social history, and review of systems sections are identical to J.P.'s April 14 visit.

157.    Likewise, the cardiovascular, neurological, and musculoskeletal sections of the physical examination section, the diagnostic impressions, treatment plan, counseling and education are word-for-word clones of the April 14 note.

158.    As discussed in paragraph 136, two key components for an E/M claim using 99213 are a problem-focused history and medical decision-making of low complexity.

159.    Because those sections of the note from J.P.'s May 5 visit are identical to the previous visit, it is impossible to verify whether Dr. Skurka conducted any review of J.P.'s history or what degree of medical decision-making was required, two key components for an E/M visit.

160.    The subsequent claim for payment was false or fraudulent within the meaning of the FCA.

161.    Medicare paid the Foot Center $52.42 for Claim Number 662815127609970. It would not have paid this amount had it known of the claim's false and fraudulent nature, or the underlying false medical record.

162.    Sometime in late-December 2016, Dr. Allen took over J.P.'s care.

163.    Dr. Allen spent little time with J.P. and did not touch his leg during encounters. Instead, a medical assistant would unwrap J.P.'s wound, and Dr. Allen would conduct a brief visual inspection before leaving the room.

164.    J.P. and his wife timed one of his encounters with Dr. Allen, which only lasted two-and-a-half minutes.

165.    J.P. switched podiatry practices due to the substandard care he was receiving at the Foot Center.

166.    The claims for E/M services provided by Dr. Allen to J.P., identified in the table below, are false because they seek reimbursement for a level of service that Dr. Allen did not provide.

| Claim Number | Service Date | CPT Code | Provider | Amount Paid |
|---|---|---|---|---|
| 662817004773500 | 12/28/2016 | 99213 | Michael Allen | $52.44 |
| 662817039389510 | 2/1/2017 | 99213 | Michael Allen | $0 |

167.    Medicare paid the Foot Center $52.44 for the E/M service in Claim Number 662817004773500.

168.    Because J.P. had not met his deductible, Medicare did not pay for Claim Number 662817039389510. J.P. paid the Foot Center $68.91 for an E/M service he did not receive.

169.    The services identified in paragraph 166 were not provided to J.P., and the Foot Center's subsequent claims for payment identified in paragraph 166 were false or fraudulent within the meaning of the FCA.

170.    The claims identified in paragraphs 149, 154, and 166 are representative examples only. The Foot Center submitted, and Dr. Allen caused to be submitted, hundreds of claims for payment to the Government Healthcare Programs seeking reimbursement for E/M services at a level that were not provided and for which the underlying medical records were falsified.

171.    The Defendants knew or should have known, within the meaning of the FCA, that the level of services were not provided, the underlying medical records were falsified, and that the related claims for payment misrepresented the service provided.

### 2. *False Claims for E/M Services Added to First-Time Encounters with Nursing Home Residents*

172.    In general, Government Healthcare Programs will not reimburse a provider for an E/M service when routine foot care is the service actually performed.

173.    In these circumstances, an E/M service provided to the same patient and billed for the same date as a routine foot care procedure is reimbursable if, and only if, the provider

renders a "significant, separately identifiable" E/M service that is beyond the usual care associated with the procedure. To be paid, the physician must add the modifier "25" to the appropriate level of E/M service on the claim form.

174.     An E/M service billed on the same day as a routine foot care service is not eligible for reimbursement unless the provider uses modifier "25" and documents the significant and separately identifiable service in the patient's medical record.

175.     The Foot Center had a policy and practice of billing federal programs for an E/M service whenever a provider rendered routine foot care to a nursing home or independent living facility patient for the first time, even though the patient received no services other than the routine foot care.

176.     The Foot Center billed these claims using the "25" modifier, indicating that a separate and identifiable procedure was performed, despite the fact that no additional service was performed.

177.     Dr. Allen instructed Dr. Richardson to bill an E/M service whenever he saw a new patient at a nursing home. As a result, Dr. Richardson completed superbills adding a CPT code for an E/M visit whenever he saw a new patient at a nursing home, even though he performed no additional service apart from the routine foot care.

178.     From January 1, 2012, to present, the Foot Center billed Medicare for an E/M service in conjunction with routine foot care nearly seventy-eight percent of the time that a provider first rendered routine foot care to a nursing home resident.

179.     By way of representative example, Dr. Richardson first treated patient H.H. on July 28, 2015.

180.     As described in paragraph 123, the Foot Center submitted Claim Number 662815244657930 seeking reimbursement for the debridement of six or more of H.H.'s toenails using CPT code 11721. Claim Number 662815244657930 also sought reimbursement for an E/M service using CPT code 99304. The Foot Center used modifier "25" to indicate

that the E/M service was a significant and separately identifiable service from the nail debridement provided to H.H.

181.    As a result of this claim, Medicare paid the Foot Center $68.02 for the E/M service purportedly rendered by Dr. Richardson.

182.    This claim was false and fraudulent under the FCA because Dr. Richardson did not provide a separate and identifiable E/M service to H.H.

183.    Medicare would not have paid this claim if it had known that the E/M service was not performed.

184.    By way of further representative example, Dr. Richardson first provided routine foot care to Patient A.J. on October 21, 2013.

185.    On October 31, 2013, the Foot Center submitted a claim to Medicare seeking reimbursement for a six-or-more-toe debridement procedure, using CPT code 11721, and a significant and separately identifiable E/M service, using CPT code 99307 with a "25" modifier (Claim Number 662813304706020).

186.    As a result of this claim, Medicare paid the Foot Center $32.23 for the E/M service purportedly provided to A.J. by Dr. Richardson.

187.    This claim was false and fraudulent under the FCA because Dr. Richardson did not provide a separate and identifiable E/M service to A.J.

188.    Medicare would not have paid this claim if it had known that the E/M service was not performed.

189.    The Foot Center and Dr. Allen knew or should have known, as that term is defined in the FCA, that it is inappropriate to bill for an E/M code when a nail debridement is the service that was performed and that the claims for payment misrepresented the service that was performed.

190.    The claims described in paragraphs 180 and 185 are representative claims only. The Foot Center, with Dr. Allen's knowledge and consent, routinely billed E/M services in

conjunction with first-time routine foot care services to hundreds more nursing home patients not identified within this Complaint. The Foot Center knowingly submitted claims for payment, and Dr. Allen knowingly caused the submission of claims for payment, for E/M services that were not provided, and received reimbursements from Government Healthcare Programs as a result.

### COUNT 1
### FALSE CLAIMS FOR ROUTINE FOOT CARE
### 31 U.S.C. § 3729(A)(1)(A)

191.     The United States incorporates by reference all paragraphs of this Complaint set out above as if fully set forth herein.

192.     Between January 1, 2012 and the present, the Foot Center knowingly presented, directly or indirectly, false or fraudulent claims for payment to the United States, including claims for routine foot care billed to the Government Healthcare Programs. The claims were false or fraudulent because they sought payment for routine foot care procedures that were either medically unnecessary or not performed.

193.     Between January 1, 2012 and the present, Dr. Allen knowingly caused to be presented, directly or indirectly, false or fraudulent claims for payment to the United States, including claims for routine foot care billed to the Government Healthcare Programs. The claims were false or fraudulent because they sought payment for routine foot care procedures that were either medically unnecessary or not performed.

194.     As a result of the false or fraudulent claims presented, or caused to be presented, by the Defendants, the United States suffered damages in an amount to be determined at trial.

### COUNT 2
### FALSE CLAIMS FOR E/M SERVICES
### 31 U.S.C. § 3729(A)(1)(A)

195.     The United States incorporates by reference all paragraphs of this Complaint set out above as if fully set forth herein.

196.    Between January 1, 2012 and the present, the Foot Center knowingly presented, directly or indirectly, false or fraudulent claims for payment to the United States, including claims for E/M services billed to the Government Healthcare Programs. The claims were false or fraudulent because they sought payment for a level of E/M services that was not performed.

197.    Between January 1, 2012 and the present, Dr. Allen knowingly caused to be presented, directly or indirectly, false or fraudulent claims for payment to the United States, including claims for E/M services billed to the Government Healthcare Programs. The claims were false or fraudulent because they sought payment for a level of E/M services that was not performed.

198.    As a result of the false or fraudulent claims presented, or caused to be presented, by the Defendants, the United States suffered damages in an amount to be determined at trial.

<u>COUNT 3</u>
CREATION AND USE OF FALSE RECORDS OR STATEMENTS
31 U.S.C. § 3729(A)(1)(B)

199.    The United States incorporates by reference all paragraphs of this Complaint set out above as if fully set forth herein.

200.    Between January 1, 2012 and the present, the Defendants knowingly made, used, or caused to be made or used, false records or statements regarding the health care and condition of patients in the form of false medical records. These records or statements were material to claims for payment submitted to the Government Healthcare Programs. If the Government Healthcare Programs had known that the claims the Foot Center submitted for payment contained or were based upon these false records or statements, the Government Healthcare Programs would not have paid the claims.

201.     As a result of the false records or statements made, used, or caused to be made or used by the Defendants, the United States suffered damages in an amount to be determined at trial.

### COUNT 4
#### UNJUST ENRICHMENT

202.     The United States incorporates by reference all paragraphs of this Complaint set out above as if fully set forth herein.

203.     Between January 1, 2013 and the present, directly or indirectly, the Defendants received and retained the benefit of federal monies paid from the Government Healthcare Programs and intended to compensate them for routine foot care and E/M services that they claimed to have performed.

204.     The routine foot care for which the Government Healthcare Programs paid the Foot Center was not medically necessary or was not performed by providers.

205.     The E/M services for which the Government Healthcare Programs paid the Foot Center were not performed at the level at which the Defendants sought reimbursement, or at all.

206.     Directly or indirectly, the Defendants have been unjustly enriched with federal monies from the Government Healthcare Programs, in an amount to be determined at trial, which they should not in equity and good conscience be permitted to retain.

### COUNT 5
#### PAYMENT BY MISTAKE

207.     The United States incorporates by reference all paragraphs of this Complaint set out above as if fully set forth herein.

208.     This is a claim for recovery of monies paid by the United States between January 1, 2013 and the present to the Foot Center as a result of mistaken understandings of fact. Dr. Allen received and retained the benefit of some of these monies.

209.    The false claims that the Defendants submitted or caused to be submitted to the United States were paid by the United States based upon mistaken or erroneous understandings of material fact.

210.    The United States, acting in reasonable reliance on the truthfulness of the claims and the truthfulness of the Defendants, paid the Foot Center certain sums of money to which they were not entitled, some of which was diverted to the personal use of Dr. Allen. In particular, the United States relied upon the Defendants' representations that the claims seeking payment for routine foot care and E/M services were medically necessary and/or performed by the Foot Center, when in fact the services were medically unnecessary or not performed. The Defendants are thus liable to account for and to pay such amounts, which are to be determined at trial, to the United States.

## PRAYER FOR RELIEF

WHEREFORE, the United States of America requests that judgment be entered in its favor and against Defendants as follows:

1.    On Counts 1, 2, and 3 under the False Claims Act, for the amount of the United States' damages, trebled as required by law, and such civil penalties as are required by law.

2.    On Counts 4 and 5, for unjust enrichment and payment by mistake, for the amounts mistakenly paid to Defendants or by which the Defendants were unjustly enriched.

3.    With respect to each Count, interest, attorney's fees, and costs as allowed by law, and any and all further relief as the Court deems just and proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, the United States demands a trial by jury on all issues raised in its Complaint.

Respectfully submitted,

ROBERT M. DUNCAN, JR.
UNITED STATES ATTORNEY

By:  /s/ Carrie B. Pond
Carrie B. Pond
Paul C. McCaffrey
Assistant United States Attorneys
260 W. Vine Street, Suite 300
Lexington, Kentucky 40507
859.233.2661
859.233.2533 (fax)
Carrie.Pond@usdoj.gov
Paul.McCaffrey@usdoj.gov